<table>
<tr><td>

DISTRICT COURT, CITY AND COUNTY OF LARIMER, STATE OF COLORADO

Court Address:  Larimer County District Court
201 La Porte Avenue
Fort Collins, CO 80521

</td><td>

DATE FILED: July 12, 2019 2:32 PM
FILING ID: 4A8CA373F0239
CASE NUMBER: 2019CV30621

</td></tr>
</table>

| | |
|---|---|
| Plaintiff: **CLINTON BLYTH,**<br><br>v.<br><br>Defendant:  **MONSANTO CO. and POUDRE VALLEY CO-OPERATIVE ASSOCIATION, INC.** | ▲ Court Use Only ▲ |
| *Attorneys for Plaintiff*<br>Roman Balaban, Atty. Reg. No. 39148<br>Andrew Ramos, Atty. Reg. No. 50543<br>**BALABAN LAW LLC**<br>8055 East Tufts Avenue, Suite 325<br>Denver, CO 80237<br>Phone Number: (303) 377-3474<br>Fax Number:    (303) 377-3576<br>E-mail Address: balaban@denverfirm.com<br>          ramos@denverfirm.com | Case Number:<br><br>Division: |

## CIVIL COMPLAINT AND JURY DEMAND

Come Now Plaintiff, CLINTON BLYTH (hereinafter "Plaintiff") through their counsel of record, Balaban Law, LLC, and for their Civil Complaint and Jury Demand against Defendants MONSANTO COMPANY and POUDRE VALLEY CO-OPERATIVE ASSOIATION INC., alleges and avers as follows:

## I.   PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Clinton Blyth, hereinafter "Plaintiff" is a natural person of the age of majority and was at all times a resident and citizen of Colorado, with a mailing address of 9604 Las Colinas Drive, Lone Tree, Colorado 80124. Mr. Blyth purchased and used Roundup for at least 40 years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2006 and had a subsequent relapse in 2015.

1

2.      Co-Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

3.      At all times relevant to this petition, Co-Defendant Monsanto Company was authorized and conducting business within the State of Colorado, more specifically, Monsanto distributed Roundup® to Poudre Valle Co-Operation Association, Inc. in Larimer County, Colorado.

4.      Co-Defendant Poudre Valley Co-Operative Association, Inc. is a Colorado Corporation with its principal place of business in Fort Collins, Colorado.

5.      At all times relevant to this petition, Co-Defendant Poudre Valley Co-Operative Association, Inc., was authorized and conducting business within the State of Colorado, more specifically, Larimer County, Colorado and/or distributed Monsanto products including Roundup® within the state of Colorado.

6.      At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

7.      At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

8.      At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

9.      Plaintiff has timely filed this lawsuit from the time the Plaintiff knew or reasonably knew of the injury and that it may have been wrongfully caused.

10.     Jurisdiction is proper in this action pursuant to C.R.S. § 13-1-124 because the incident underlying this cause of action occurred within the County of Larimer, State of Colorado.

11.     Venue is proper in Larimer County pursuant to C.R.C.P. 98(c)(5), because the tort that triggered the claims herein occurred within the County of Larimer, State of Colorado.

## II.     **INTRODUCTION**

12.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

13.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

14.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

15.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

16.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

17.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

18.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

19.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## III.    FACTS

20.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

21.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

23.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

24.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

25.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the States of Missouri.

28.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the

conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

29.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

31.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

7

32.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

33.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

35.     Three top executives of IBT were convicted of fraud in 1983.

36.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

37.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

38.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

39.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

40.    Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

41.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to

mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)         "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

42.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)         its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b)         its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c)         its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d)         its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)         glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)         its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

45.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

46.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

47.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

48.    In assessing an agent, the IARC Working Group reviews the following information:

a)        human, experimental, and mechanistic data;

b)        all pertinent epidemiological studies and cancer bioassays; and

c)        representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

49.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

50.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

52.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

13

53.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

54.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

55.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

56.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

57.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

59.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

60.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

61.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

62.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

63.     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied.

Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

64.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

65.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

66.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

67.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

68.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

69.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

70.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

71.     Plaintiff incorporates by reference all prior paragraphs of this Petition as if fully set forth herein.

72.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

73.     At all relevant times, Defendants have maintained that Roundup is safe, non-toxic, and non-carcinogenic.

74.     Indeed, even as of July 2016, Defendants continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[1]

---

[1] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

75.     As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

76.     Furthermore, Defendants are estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continues to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of its intentional concealment of these facts.

77.     Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

IV.    **CLAIMS**

## COUNT I STRICT LIABILITY (DESIGN DEFECT) - AS TO DEFENDANT MONSTANTO

78.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

79.    Plaintiff brings this strict liability claim solely against Defendant Monsanto for defective design.

80.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Defendant Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Defendant Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

81.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

82.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

83.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto  were

defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

84.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant  Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

85.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

86.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)          When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)          When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c)        When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d)        Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

    e)        Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f)        At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

    g)        Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

    h)        Monsanto could have employed safer alternative designs and formulations.

87.    Plaintiff was exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

88.    At all times relevant to this litigation, Plaintiff used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

89.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

90.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.

Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

91.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

92.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

93.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

94.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Defendant Monsanto misconduct and omissions, Plaintiff would not have sustained their injuries.

95.     Defendant Monsanto's conduct, as described above, was reckless. Defendant Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public.

96.     As a direct and proximate result of Defendant Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer

grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) - AS TO DEFENDANT MONSANTO

97.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

98.     Plaintiff brings this strict liability claim against Defendant Monsanto for their failure to warn.

99.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

100.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

101.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a

continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

102.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

103.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

104.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

105.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto  failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

106.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

107.    Plaintiff was exposed to Roundup® products in the course of his employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

108.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

109.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

110.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

111.    The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively

promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

112.    To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

113.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff.

114.    Defendant Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

115.    The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries.

116.    Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

117.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered severe injuries and have endured physical pain

and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

## COUNT III NEGLIGENCE - AS TO ALL DEFENDANTS

118.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

119.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

120.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

121.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

122.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

123.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products

could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

124.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

125.    As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

126.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

127.    Monsanto was negligent in the following respects:

a)        Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)        Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally

concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)        Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)        Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)        Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)        Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)        Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)        Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i)        Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)          Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k)          Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)          Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m)          Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)          Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

128.    Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

129.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

130.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

131.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

132.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

## COUNT IV:  BREACH OF EXPRESS WARRANTIES - AS TO ALL DEFENDANTS

133.    Plaintiffs incorporates by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

134.    At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

135.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants expressly warranted to its consumers and users—including Plaintiff that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

31

136.    Defendants, however, failed to disclose that Roundup® had dangerous propensities when used as intended and that the use of and/or exposure to roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

137.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

138.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiff.

139.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

140.    Neither Plaintiff nor Plaintiff's employers could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

141.    Defendants' breaches constitute violations of state common laws, including, but not limited to, the following statutory provisions as applicable:

- Co. Rev. St. § 4-2-316 (2017);

142.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries. As a direct and proximate result of Defendants' placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff has developed NHL and has been injured catastrophically and has been caused severe and

permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and

comfort, and economic damages, including for medical care and treatment.

143.    The harm caused by Defendant's Roundup® products far outweigh their benefit,

rendering the products more dangerous than an ordinary consumer or user would expect and

more dangerous than alternative products.

144.    As a direct and proximate result of Defendants' wrongful acts and omissions

Plaintiff has suffered severe and permanent physical and emotional injuries.  Plaintiff has

endured pain and suffering, have suffered economic loss, including significant expenses for

medical care and treatment, and will continue to incur these expenses in the future.

## COUNT V:  BREACH OF IMPLIED WARRANTIES- AS TO ALL DEFENDANTS

145.    Plaintiff incorporates by reference each and every other paragraph of this Petition

as if each were set forth fully and completely herein.

146.    At all times relevant, Defendants engaged in the business of testing, developing,

designing, formulating, manufacturing, selling, distributing, and promoting Roundup® products,

which are defective and unreasonably dangerous to users, consumers, and those in proximity to

users, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

These actions were under the ultimate control and supervision of Defendants.

147.    Before the time Plaintiff was exposed to the use of the aforementioned Roundup®

products, Defendants impliedly warranted to its consumers and users—including Plaintiff and

Plaintiff's employers—that its Roundup® products were of merchantable quality and safe and fit

for the use for which they were intended; specifically, as horticultural herbicides.

148.    Defendants, however, failed to disclose that Roundup® has dangerous propensities

when used as intended and that the use of and/or exposure to Roundup® and glyphosate-

containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

149.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

150.    The Roundup® products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

151.    At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including Plaintiff, would use Roundup® products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®.

152.    Defendants intended that the Roundup® products be used in the manner in which Plaintiff in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

153.    In reliance upon Defendants' implied warranty, Plaintiff used or was in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

154.    Neither Plaintiff nor Plaintiff's employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

155.    Defendants breached their implied warranty to Plaintiff in that the Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately

tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

156.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

157.    As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries.  Plaintiff has endured pain and suffering, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

## V. PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES

WHEREFORE, Plaintiff has suffered non-economic damages, including, but not limited to, physical and mental pain and suffering, emotional stress, impaired quality of life, and economic damages, including, but not limited to, medical expenses and loss of income as a direct result of the Defendants' negligent acts.

NOW THEN, Plaintiff prays for an Order of Judgment in favor of the Plaintiff and against the Defendants as follows:

a.)    For judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial for actual and consequential damages, including noneconomic, economic, and physical impairment;

b.)    For pre-judgment interest, which has accrued since the date of the tort pursuant to **C.R.S. §13-21-101**;

c.)    For complete and total compensation for all of Plaintiff's medical bills;

d.)    For all costs in the prosecution of this matter; and

e.)    For any and all further relief as the Court may deem proper and just.

Respectfully submitted this 12th day of July, 2019.

**BALABAN LAW LLC**

*Original Signature on File at the Offices*
*Of Balaban Law LLC*

/s/ Andrew S. Ramos
Andrew S. Ramos, Atty. Reg. 50543
Roman Balaban, Atty. Reg. 39148
***ATTORNEYS FOR PLAINTIFF***

Plaintiff's Address:
9604 Las Colinas Drive,
Lone Tree, Colorado 80124

*This pleading was filed with the Court through the ICCES Electronic Filing Procedures, under C.R.C.P. 121, § 1-26.  As required by those rules, the original signed copy of this pleading is on file with Balaban Law LLC.*